IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JASON MASHANEY,

    Plaintiff,

vs.                Case No. 09-3105-JTM

DALE R. CALL, AND ELIZABETH L. RICE,

    Defendants.

MEMORANDUM AND ORDER

The present matter arises on defendants' Motion for Summary Judgment (Dkt. No. 33). For the following reasons the court grants the defendants' motion.

**I. Findings of Fact**

Plaintiff, Jason Mashaney, an inmate at the Kansas Department of Corrections (KDOC) filed the present action on May 27, 2009, alleging a violation of 42 U.S.C. § 1983 when defendants seized one magazine and three flyers from him because they contained prohibited material in violation of Kan. Admin. Regs. § 44-12-313 (2009), which prohibits inmates from possessing sexually explicit materials. Specifically, plaintiff alleges that:

> Defendants Elizabeth Rice and Dale Call in their official and private capacity, while acting under color of state law, did with deliberate indifference, and/or reckless disregard, and/or deliberate malicious intent, violate plaintiff's First Amendment right to receive information, petition his government with grievances in a meaningful way, and his Fourteenth Amendment right to Due Process of Law of the United States Constitution. Defendants violated plaintiffs rights when they approved the seizure of plaintiffs "Interview" magazine, and the three (3) flyers employing a

seizure and appellate procedure that obstructs plaintiffs ability to compose and file a competent appeal of the seizure of his mail.

(Dkt. No. 1).

At all relevant times, plaintiff was incarcerated at the El Dorado Correctional Facility (EDCF). The defendants in this case are Dale Call and Elizabeth Rice. At the pertinent times relevant to this matter Call was a Corrections Specialist III at EDCF, and he was also the Publications Review Officer, the facility coordinator, and mail review officer. Rice was a Corrections Manager at EDCF and was also the Secretary of Correction's Designee for grievance appeals, censorship appeals, and property claims.

Call reviewed and censored one publication and three items of mail sent to plaintiff because the material contained sexually explicit material. KDOC regulations provide that mail or other publications may be censored if it "contains sexually explicit material, as defined and proscribed by K.A.R. 44-12-313." *See* KAN. ADMIN. REGS. §§ 44-12-601(d)(1)(E), (g)(3)(A) (2009). Section 44-12-313 provides:

> (a) No inmate shall have in possession or under control any sexually explicit materials, including drawings, paintings, writing, pictures, items, and devices.
> (b) The material shall be considered sexually explicit if the purpose of the material is sexual arousal or gratification and the material meets either of the following conditions:
>> (1) Contains nudity, which shall be defined as the depiction or display of any state of undress in which the human genitals, pubic region, buttock, or female breast at a point below the top of the aerola [sic] is less than completely and opaquely covered; or
>> (2) contains any display, actual or simulated, or description of any of the following:
>>> (A) Sexual intercourse or sodomy, including genital-genital, oral-genital, anal-genital, and anal-oral contact, whether between persons of the same or differing gender;
>>> (B) masturbation;
>>> (C) bestiality; or
>>> (D) sadomasochistic abuse.

2

(c) Each violation of this regulation by inmates classified as sex offenders shall be a class I violation.
(d) Each violation of this regulation by inmates not classified as sex offenders shall be a class II violation.
(e) Each violation of this regulation by any inmate if the sexually explicit material depicts, describes, or exploits any child under the age of 18 years shall be a class I offense.

KDOC amended Kan. Admin. Regs. § 44-12-313 to prohibit sexually explicit material within its correctional facilities on July 2, 2004. The Secretary of Corrections, Roger Werholtz, a team of treatment-provider experts, and corrections administrators made that decision for three reasons: (1) to maintain security and order; (2) to facilitate the management, treatment, and rehabilitation of sex offenders; and (3) to protect the general public. Sexually explicit materials tend to disrupt the overall security of the correctional facility. The prohibition also lessens sexual harassment on staff and other inmates and reduces the potential for sexual assaults. KDOC employs both males and females, and inmates can use sexually explicit materials to harass staff members. Before § 44-12-313 was enacted, staff members complained about exposure to the materials and some inmates made comparisons between employees and individuals in the magazines and voiced those comparisons to the employees. This exposure created the potential for staff to file sexual harassment complaints.

Prohibiting sexually explicit material also helps KDOC staff manage the level of conflict within the prison setting. Approximately 22% of inmates in KDOC facilities are sex offenders. Sexually explicit material can inhibit the treatment, management, and rehabilitation of sex offenders. The material can cause these offenders to have deviant thoughts and has the potential to cause the offenders to act on these thoughts. By prohibiting the material, KDOC staff can better help sex offenders focus and manage their detrimental thoughts and behaviors. KDOC cannot limit the prohibition to sex offenders because there are no separate facilities for sex offenders. Additionally,

3

sexually explicit materials are seen as something of value, the possession of which can lead inmates to having power over one another, which creates a system of credit and debt. It would create a major security threat if one group was allowed to possess the material while the other was not. Finally, the prohibition helps maintain public safety by reducing the level of conflict inside the prison system and allowing the facilities to focus on treatment with the goal of inmates becoming law-abiding citizens when released. Despite the prohibition on sexually explicit materials, inmates do retain the ability to view periodicals in general and send and receive mail as long as neither contains prohibited content. Inmates also have access to publications provided in the general libraries of each KDOC facility.

Prior to the amendments in Kan. Admin. Regs. §§ 44-12-313 and 44-12-601, KDOC staff spent excessive amounts of time reviewing individual publications to determine what was allowed, processing and deciding appeals, and processing the notifications. Given the volume of mail, redacting the prohibited material from each publication or piece of mail was not a workable solution. In addition to the time and expense involved, KDOC also worries about the legal ramifications of altering publications without the publishers' permission.

On March 20, 2009, Call seized and censored a color flyer sent to plaintiff by "Surrogate Sisters." Call censored the flyer because it contained "nudity as defined by KAR 44-12-313." (Dkt. No. 34, Ex. 1a). Plaintiff appealed to Rice on March 27, and on March 31, she upheld the censorship decision. On March 24, and April 14, Call reviewed and censored two more flyers sent to plaintiff by Surrogate Sisters because the flyers contained "nudity as defined by KAR 44-12-313." (Dkt. Nos. 34, Ex. 3a & Ex. 4a). Plaintiff again appealed to Rice, and she upheld the censorship decisions.

On March 23, 2009, Call censored plaintiff's April 2009, edition of "Interview" magazine. Call censored the magazine because "pages 72-73 shows a couple embraced in a sexually provocative pose in which the female is nude and displaying her bare breasts. Additionally, other photographs in this magazine violate the nudity policy as outlined in KAR 44-12-313." (Dkt. No. 34, Ex. 2a). On March 27, plaintiff appealed to Rice. Rice upheld Call's censorship decision on April 10, and stated:

> Pursuant to IMPP 12-134, the departmental mail review officer reviewed the above noted publication. The publication was withheld due to content that meets the description of sexually explicit material as set out in K.A.R. 44-12-313 and due to content that meets the criteria for censorship of mail, in whole, or in part, as described in K.A.R. 44-12-601.

(Dkt. No. 34, Ex. 2b).

**II. Legal Standard**

Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hosp.*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Nat. Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Id.* Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (quoting FED. R. CIV. P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

**III. Conclusions of Law**

The present issues for consideration in plaintiff's 42 U.S.C. § 1983 action are (1) whether the defendants violated plaintiff's First Amendment rights to receive information and to petition the government for redress of grievances when they censored four publications sent to plaintiff because the materials were sexually explicit materials as defined by KAN. ADMIN. REGS. § 44-12-313; and (2) whether defendants violated plaintiff's Fourteenth Amendment Due Process rights by using an appellate procedure that obstructed plaintiff's ability to file a competent appeal and by denying him the ability to view the material before defendants censored it.

To prevail on a 42 U.S.C. § 1983 claim, the plaintiff must show that he "suffered a deprivation of a federally protected right." *Crown Point I, L.L.C. v. Intermountain Rural Electric Ass'n*, 319 F.3d 1211, 1216 (10th Cir. 2003). Because plaintiff is proceeding pro se, this court construes his arguments liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Price v. Philpot*, 420 F.3d 1158, 1162 (10th Cir. 2005). However, for the following reasons, plaintiff's arguments fail.

*A. First Amendment Claims*

At issue is the defendants' ability to censor publications and mail from plaintiff pursuant to Kan. Admin. Regs. § 44-12-313. This district, the Tenth Circuit, and the Kansas Court of Appeals have upheld the constitutionality of this regulation. *See Strope v. Collins*, 315 Fed. App'x 57, 60 (10th Cir. 2009); *Sperry v. Werholtz*, No. 04-3125, 2010 WL 1980305, at *9 (D. Kan. May 18, 2010); *Washington v. Werholtz*, 40 Kan. App.2d 860, 869, 197 P.3d 843, 849 (2008). Using the standard mandated by the Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987), this court also finds that this regulation is constitutional and that defendants reasonably applied it in this case.

1. Right to Receive Information

"Inmates have a First Amendment right to receive information while in prison to the extent the right is not inconsistent with prisoner status or the legitimate penological objectives of the prison." *Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir. 2004) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). In *Turner v. Safley*, the Supreme Court established the standard governing the constitutionality of a prison regulation. 482 U.S. at 89. That standard provides: "[W]hen a prison

regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* (applying the standard to a regulation which restricted prisoners' access to mail and ability to marry). Additionally, *Turner* enunciated four factors a court must analyze when evaluating a challenged regulation. *Id.* at 89-91. These factors are: (1) whether there is a valid, rational connection between the prison regulation and the government interest asserted for the regulation; (2) whether there are alternative means of exercising the asserted right; (3) the impact of the accommodation of the asserted right on the prison staff and other inmates; and (4) the absence of ready alternatives. *Id.* The prisoner has the burden to disprove the validity of the regulation. In *Thornburgh v. Abbott*, the Supreme Court applied this standard to prison regulations restricting prisoners' access to incoming publications. 490 U.S. 401 (1989).

*a. Rational Connection*

The first *Turner* factor—whether there is a valid, rational connection between the prison regulation and the government interest asserted for the regulation—requires consideration of three additional components. "[W]e must determine whether the governmental objective underlying the regulations at issue is (1) legitimate, and (2) neutral, and (3) that the regulations are rationally related to that objective." *Thornburgh*, 490 U.S. at 414 (alterations added). A regulation aimed at furthering prison security, safety, or rehabilitation meets the requirement of a legitimate regulation. *Id.* at 415 (prison security); *Jones v. Salt Lake County*, 503 F.3d 1147, 1156 (10th Cir. 2007) (prison safety); *Pell*, 417 U.S. at 823 (rehabilitation). Neutrality exists when "prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security" or when "a regulation furthers an important or substantial government interest unrelated

to the suppression of expression." *Thornburgh*, 490 U.S. at 415; *Jones*, 503 F.3d at 1153. Finally, to show a rational relationship between the regulation and a legitimate penological interest, prison officials only need to show that they reasonably thought the regulation would advance the asserted interest. *See Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999); *see also Thornburgh*, 490 U.S. at 416. The court must decide whether that belief was reasonable. A regulation is unconstitutional if the logical connection between the regulation and the asserted goal is so remote that the regulation is arbitrary or irrational. *Turner*, 482 U.S. at 89-90. "Where the regulations at issue concern the entry of materials into the prison . . . a regulation which gives prison authorities broad discretion is appropriate." *Thornburgh*, 490 U.S. at 416.

As set forth above, Secretary Werholtz and others amended Kan. Admin. Regs. § 44-12-313 for three reasons: (1) to maintain security and order in the prison; (2) to assist in the treatment and rehabilitation of sex offenders; and (3) to protect the public at large. Maintaining security and order in the prison and assisting in rehabilitation are legitimate objectives. *Thornburgh*, 490 U.S. at 415 (prison security); *Jones*, 503 F.3d at 1156 (prison safety); *Pell*, 417 U.S. at 823 (rehabilitation). The regulation is neutral. Secretary Werholtz made the decision to implement the regulation only for the three purposes just noted. The regulation affects all inmates regardless of gender or sexual orientation, and the reason for prohibiting sexually explicit materials is unrelated to their content. Further, defendants' affidavits reflect a rational connection between the regulation and these government interests. Sexually explicit materials tend to disrupt the overall security of the prison. This prohibition also keeps staff and other inmates safe by lowering the potential for sexual harassment and sexual assaults. *See Mauro*, 188 F.3d at 1060 (holding that the relationship between the jail's policy of prohibiting sexually explicit materials and the goal of preventing harassment were

9

rationally related). Before the amendments, KDOC staff had complained about exposure to these materials. Inmates would also make comparisons between employees and pictures in the publications.

The amended regulation also helps alleviate conflict by removing one form of economic leverage inmates may exert over one another, which otherwise often results in debt collection, extortion, and even violence. Additionally, around 22% of inmates in KDOC custody are sex offenders. Access to sexually explicit materials can be a detriment to the treatment of these inmates. Defendants assert that these two benefits also help protect the public by removing conflict in the prison and by removing obstacles in the treatment of sex offenders. While more remote, they are rationally connected to the regulation. There is a rational connection between the regulation and KDOC's stated interests because the regulation directly promotes the stated objectives. *See Jones*, 503 F.3d at 1155-56 (finding a rational connection because "[t]he jail's ban on inmate access to . . . 'sexually explicit material' also protects the safety of jail personnel and other inmates").

*b. Alternative Means*

Under the second *Turner* factor—whether there are alternative means of exercising the asserted right—the Court requires that other means of expression, not necessarily the same mode of communication, remain available. *Thornburgh*, 490 U.S. at 417-18. Alternatives need not be ideal, they must only be available. *Jones*, 503 F.3d at 1153.

This factor is met, plaintiff still retains the ability to view other publications through subscription orders from family or friends, or through the prison general library. The regulation does

not affect the ability of the inmate to receive mail if not sexually explicit. Thus, alternative means of communication exist.

*c. Impact of Accommodation*

The third *Turner* factor is the impact of the accommodation of the asserted right on the prison staff and other inmates. In interpreting this factor, the *Turner* Court stated:

> In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order. When accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials.

482 U.S. at 90. As previously stated, allowing sexually explicit materials tends to disrupt the overall security of the prison. Each of the following has been mentioned above. The ban on sexually explicit materials helps lower the risk of sexual harassment and sexual assault. The regulation also aids in the rehabilitation of sex offenders within the KDOC. Further, without this regulation, KDOC staff would spend excessive time reviewing publications and monitoring the inmates to prevent the potential problems listed above. Accommodation would also negatively impact staff and other inmates because sexually explicit materials are items of value which lead to one inmate having power over another inmate, creating a system of credit and debt. This problem would be further exacerbated if an entire group of inmates—sex offenders—were precluded from possessing the materials but all other inmates were not. Inmates possessing such materials could gain immediate power over inmates without the materials, which could create a major security threat. Accommodation of this right would have a negative impact on staff and other inmates.

*d. Absence of Ready Alternatives*

The final factor—the absence of ready alternatives—provides evidence of the reasonableness of the regulation. *Turner*, 482 U.S. at 90. On the other hand, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* "This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.* at 90-91. If an inmate can point to an alternative that fully accommodates the prisoner's rights at a *de minimis* cost to the valid penological interests, the court may consider that as evidence that the regulation does not meet the reasonable relationship standard. *Id.* at 91.

Plaintiff has not produced any alternative that fully accommodates his right; in fact, plaintiff has not supplied any alternative at all. On the other hand, defendants have shown that requiring KDOC staff to redact portions of each publication or piece of mail is costly. Additionally, prohibiting the materials from only sex offenders is not practical because the inmates are not housed separately, and even if they were, this would give other inmates power over sex-offender inmates, which could cause security problems. Plaintiff's failure to suggest any ready alternatives provides evidence of the reasonableness of the regulation. Because defendants do not have to implement a regulation that is least restrictive of plaintiff's First Amendment rights, this factor is met.

To summarize, the prohibition on sexually explicit materials is legitimate, neutral, and reasonably related to prison security, rehabilitation of sex offenders, and public safety. The regulation allows other modes of expression and accommodation of the right would have an effect of the security of the prisons. Plaintiff has failed to establish a ready alternative and defendants

affirmatively proved the reasonableness of the regulation. The court, thus, concludes that the regulation is valid under *Turner* and is not an unconstitutional infringement of the First Amendment right to receive information. Next, the court must assess whether defendants reasonably applied the regulation in this case.

2. Defendants' Application of Kan. Admin. Regs. § 44-12-313 to Plaintiff's Materials

Plaintiff also argues that application of Kan. Admin. Regs. § 44-12-313, was not reasonably applied to him. Specifically, plaintiff challenges defendants' actions of censoring the April 2009 edition of "Interview" magazine and three color flyers available for purchase sent to him by "Surrogate Sisters."

The court has set out Kan. Admin. Regs. § 44-12-601(g)(3)(A) and § 44-12-313 in its Findings of Fact above. Section 44-12-313 creates a two-part test to determine what materials are sexually explicit. First, the material is sexually explicit if the purpose of the material is sexual arousal or gratification. Second, the material must contain either nudity, as defined in subsection (b)(1), or depict the physical acts listed in subsection (b)(2)(A)-(D).

Defendant Call, as Publications Review Officer for KDOC and mail review officer at EDCF, reviewed and censored plaintiff's April 2009 edition of Interview magazine. As mentioned above, Call censored the magazine because it contained images of a couple in a sexually suggestive pose, the female bare-breasted, and other photos which violated the nudity policy. The pages in question do contain this content. Because Call found the photo was "sexually provocative," and the photo clearly shows a female's breast, this court concludes that Call's application of Kan. Admin. Regs. § 44-12-313 was not unreasonable. On administrative appeal, Rice upheld Call's determination.

As with Call's application of the regulation, this court finds Rice reasonably applied the regulation to plaintiff's Interview magazine.[1]

Plaintiff argues that the court should deny defendants summary judgment because there is a factual dispute about whether the purpose of the magazine is sexual arousal or gratification. Specifically, plaintiff identifies several pieces of evidence that demonstrate the existence of a material dispute of fact. First, plaintiff obtained a letter from a customer service representative from Interview magazine which states:

> INTERVIEW Magazine is the ultimate insider's magazine, bringing its readers intimate conversations with the biggest celebrities and hottest young stars, shaping pop culture today and tomorrow. It also features movies, music, plus the latest fashion, renowned contributors, and the greatest photography.

(Dkt. No. 35, Ex. A). Plaintiff argues that it is not defendants' job to determine the purpose of the material and defendants must consider the publisher's purpose. However, contrary to this argument, it is the prison officials' job to evaluate and discern the intent of the publisher when applying Kan. Admin. Regs. § 44-12-313. The publisher's intent is irrelevant except to the extent that it is taken into consideration by defendants when applying the regulation. Regardless, the letter from Interview magazine fails to establish the publisher's purpose for the April 2009 edition of the magazine, much less the picture contained on pages 72-73. The letter provides only the overall goal of the magazine, it does not purport to provide a purpose for the specific magazine or picture at issue in this case.

---

[1] Rice also stated in her affidavit that:
Applying [K.A.R. § 44-12-313], I reviewed each listed publication and item of mail, and the decision to censor regarding these items. I decided to uphold each of the censorship decisions because the publications and mail in question are in violation of K.A.R. 44-12-601 and 44-12-313 as (1) the purpose of the publications and mail either in whole or in part is sexual arousal or gratification; and (2) the publications and mail contain either nudity, including photographs displaying exposed buttocks, female breasts at a point below the top of the areola, and human genitals, or descriptions of a variety of sex acts. As such, the Publication Review Officer's decision to censor in each instance was appropriate.
(Dkt. No. 34, Ex. 4, para 25).

14

Second, plaintiff argues that certain emails between Call and Rice and other KDOC officials show defendants did not properly apply Kan. Admin. Regs. § 44-12-313. These emails do not establish defendants' misapplication of the regulation to plaintiff's materials. *See* (Dkt. No. 35, Exs. D-F). The emails between defendants and another prison official merely establish defendants' interpretation of the regulation for the purposes of applying it uniformly throughout KDOC. Furthermore, the emails were sent in September and October of 2008—over five months before defendants seized plaintiff's materials—and did not even mention plaintiff or the censorship surrounding this case. Plaintiff's arguments challenging defendants' application of § 44-12-313 to the Interview magazine must fail.

Next, this court will analyze Call's application of the regulation to the three flyers seized from plaintiff. Like publications, mail may be censored if it contains sexually explicit material as defined in Kan. Admin. Regs. § 44-12-313. *See* KAN. ADMIN. REGS § 44-12-601(d)(1)(E). As noted, on March 20, March 24, and April 14, 2009, Call reviewed and censored three color flyers sent to plaintiff by Surrogate Sisters. On each occasion, Call sent notification to plaintiff informing him that he seized the flyer because it was "[s]howing nudity as defined by KAR 44-12-313." (Dkt. No. 34, Ex. 1a). Additionally, Call stated in his affidavit that he censored each flyer because "the overall intent of the photographs offered for sale in the flyer is for sexual arousal or gratification." (Dkt. No. 34, Call Aff. para 35). When Rice reviewed the flyers on appeal she found that "[p]ursuant to K.A.R. 44-12-601, the mail review officer reviewed the noted mail and withheld the mail due to content that meets the criteria for censorship of mail, in whole, or in part." (Dkt. No. 34, Ex. 1b). Neither Call's nor Rice's application of Kan. Admin. Regs § 44-12-313 was unreasonable.

Plaintiff argues that defendants misapplied the regulation because a portion of the order form on the flyers provides that one can purchase "[s]emi (non) Nude flyers." *See* (Dkt. No. 35, Ex. B). However, the publisher's description of the flyers is not controlling and based on a review of the flyers at issue, the court concludes the defendants reasonably applied the regulation.

Plaintiff has provided only conclusory allegations that defendants unreasonably applied Kan. Admin. Regs § 44-12-313. "To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Intern., Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). Because plaintiff has failed to show the existence of a genuine issue of material fact regarding the alleged infringement of his First Amendment right mail, the court grants defendants' motion on this claim.[2]

3. Right to Petition for Redress of Grievances

Plaintiff argues that defendants violated his First Amendment right to petition the government for redress of grievances by denying him access to the courts. "Like others, prisoners have the constitutional right to petition the Government for redress of their grievances, which includes a reasonable right of access to the courts." *Hudson v. Palmer*, 468 U.S. 517, 523 (1984) (citing *Johnson v. Avery*, 393 U.S. 483, 485 (1969)). To establish a denial of access to the courts claim a plaintiff must demonstrate "actual injury." *Cosco v. Uphoff*, 195 F.3d 1221, 1224 (10th Cir.

---

[2]Plaintiff urges this court to review defendants' censorship decisions regarding the following additional materials: four magazines, 10 photographs, and one color flyer. These items were not contained in plaintiff's Complaint and he never sought leave to amend his Complaint; thus, this court is without authority to review those censorship decisions in this Memorandum and Order. Nevertheless, the court notes that inclusion of claims regarding these materials would not change the outcome. Defendants reasonably applied Kan. Admin. Regs. § 44-12-313 to the materials in issue in this case and provided plaintiff with minimal procedural safeguards when these materials were censored.

1999) (citing *Lewis v. Casey*, 518 U.S. 343, 349 (1996)). Actual injury consists of "actual prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or to present a claim." *Lewis*, 518 U.S. at 348.

Plaintiff's argument fails because he cannot sustain his burden to show actual injury. There is no evidence that plaintiff was denied access to the courts or hampered from meeting filing deadlines. In fact, plaintiff clearly did have access to the court because he was able to file the current lawsuit and all the necessary responses to defendants' summary judgment motion. Plaintiff may be unhappy with the administrative procedures utilized by KDOC or its result, but his disapproval does not constitute a constitutional denial of access to the courts. Therefore, because plaintiff failed to show actual injury, summary judgment on plaintiff's right to petition the government claim is granted.

*B. Fourteenth Amendment Due Process Claim*

Last, plaintiff claims defendants violated his Fourteenth Amendment rights by "deny[ing] plaintiff the ability to file a competent appeal of mail seized pursuant to K.A.R. 44-12-313, because plaintiff was not allowed to see what had been seized, thereby denying him the ability to determine if the item did, in fact, violate the directive of K.A.R. 44-12-313." (Dkt. No. 1). For the following reasons, this claim fails.

When analyzing a procedural due process claim under the Fourteenth Amendment, a court must consider (1) whether the individual possessed a liberty or property interest to which due process protection is available; and (2) whether the person was afforded the appropriate level of process. *Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1219 (10th Cir. 2006); *see also Mathews*

*v. Eldridge*, 424 U.S. 319, 332-33 (1976). The liberty interest in uncensored communications is a "liberty" interest within the meaning of the Fourteenth Amendment. *Procunier v. Martinez*, 416 U.S. 396, 418 (1974), *overruled on other grounds by Thornburgh*, 490 U.S. at 413-14. . However, this is a "qualified liberty interest" that is not absolute. *Jacklovich*, 392 F.3d at 433 (10th Cir. 2004) (citing *Procunier*, 416 U.S. at 418). To protect that interest, a prison must use minimal procedural safeguards before prison officials can censor an inmate's communication. *Jacklovich*, 392 F.3d at 433. These safeguards include: (1) notification of censorship; (2) ability of the inmate and publisher to protest the censorship decision; (3) and appeals must be handled by a prison official other than the person who made the initial censorship decision. *Id.*

Kan. Admin. Regs. § 44-12-601(d)(2) provides these minimal procedural safeguards. The regulation provides:

> (2) If any communication to or from an inmate is censored, all of the following requirements shall be met:
> (A) Each inmate shall be given a written notice of the censorship and the reason for the censorship, without disclosing the censored material.
> (B) Each inmate shall be given the name and address of the sender of incoming mail, if known, or the addressee of outgoing mail and the date the item was received in the mail room. Notice of the censorship of correspondence by the facility shall be provided to the sender, if known, by staff in the facility's mail room within three business days of the decision to censor.
> (C) The author or addressee of the censored correspondence shall have 15 business days from the date of the notice of censorship to protest that decision.
> (D) All protests shall be forwarded to the secretary of corrections or the secretary's designee for final review and disposition.
> (E) Each inmate shall have the option of having censored correspondence or other materials in their entirety either mailed out at the expense of the inmate or discarded.

Defendants followed this procedure after they censored each of plaintiff's materials. In each instance, Call made the initial censorship decision and notified plaintiff of that decision. The

notification of censorship of the color flyers provided that "[b]oth the sender and the recipient will have (15) business days from the above date to file a written protest for final review by the Secretary of Correction's designee by completing the protest section on the reverse side of this form." (Dkt. No. 34, Ex. 1a). The censorship notice regarding plaintiff's Interview magazine provided the same opportunity to appeal the decision. (Dkt. No. 34, Ex. 2a). Plaintiff chose to protest each censorship decision to the Secretary of Correction's designee (defendant Rice). In each appeal, Rice independently reviewed Call's censorship decision and decided to uphold it. So, although plaintiff does have a liberty interest in uncensored communication, defendants provided him adequate process when they censored the four pieces of material in question. It is immaterial that defendants did not show plaintiff the materials seized before censoring them. *See Jacklovich*, 392 F.3d at 433 (stating procedural due process requirements in a similar context). A prisoner only needs to be given notice, an ability to challenge the decision, and an independent appeals process. *Id.* Because plaintiff received such process, he was not denied due process.

Finally, plaintiff asserts, in his response to defendants' Motion for Summary Judgment, a retaliation claim against defendants alleging that: "Plaintiff has been transferred to a more restrictive prison, for no other apparent reason but retaliation." (Dkt. No. 35). Even though plaintiff's arguments and responses are construed liberally, the Tenth Circuit "has repeatedly insisted that pro se parties follow the same rules of procedure that govern other litigants." *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994). Under Fed. R. Civ. P. 15(a)(1)(A)-(B), a party may freely amend the complaint within "21 days after serving it, or if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion . . . whichever is earlier." At all other times the party must seek leave of the court to amend its pleading.

19

FED. R. CIV. P. 15(a)(2). It is not appropriate for plaintiff to assert his retaliation claim in his response to defendants' summary judgment motion, and the court will not consider it. *See Boyer v. Bd. of County Comm'rs of Johnson County*, 922 F. Supp. 476, 482 (D. Kan. 1996) ("It is inappropriate to use a response to a motion to dismiss to essentially raise a new claim for the first time."); *Davis v. Seiter*, No. 96-3316, 1998 WL 404354, at *8 (D. Kan. June 30, 1998) (holding that court will not consider new claims raised for the first time in a response to summary judgment).

For the reasons stated above, the court finds that defendants are entitled to summary judgment on all of plaintiff's claims.

IT IS ACCORDINGLY ORDERED this 29th day of December 2010, that defendants' Motion for Summary Judgment (Dkt. No. 33) is granted.

s/J. Thomas Marten
J. THOMAS MARTEN, JUDGE